**IN THE U.S. DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| WAVERLEY VIEW INVESTORS, LLC, ) | |
| 1420 Beverly Road ) | |
| Suite 300 ) | |
| McLean, Virginia 22101 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:14-cv-01527 |
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| Serve on ) | |
| ) | |
| Rod J. Rosenstein ) | |
| United States Attorney for the District of Maryland ) | |
| Attn: Civil Process Clerk ) | |
| 36 S. Charles Street, 4th Floor ) | |
| Baltimore, Maryland  21201 ) | |
| ) | |
| and ) | |
| ) | |
| Eric H. Holder, Jr. ) | |
| Attorney General of the United States ) | |
| United States Department of Justice ) | |
| 950 Pennsylvania Avenue, N.W. ) | |
| Washington, D.C. 20530 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

### INTRODUCTION

1.      Waverley View Investors, LLC ("WVI" or "Plaintiff"), a Maryland limited liability

corporation, is the current owner of property (the "Property") located in Frederick, Maryland, just south

and west of the U.S. Army Garrison Fort Detrick, Maryland ("Fort Detrick").  Groundwater on the Property has become contaminated – including with trichloroethylene ("TCE") at levels 14 – 42 times the federal maximum contaminant level – as a result of the U.S. Army's negligence in its chemical handling and disposal practices at Fort Detrick.  Plaintiff WVI brings this action to recover damages due to the tortious acts and omissions of defendant the United States of America ("the United States" or "Defendant") and its instrumentalities, agents, servants, and employees with respect to the United States' historical use and disposal of chemicals and other contaminants at, and failure to adequately and timely prevent, abate, and remediate the contamination and threatened migration of such hazardous substances from, Fort Detrick.

2.      The United States' failures (a) to properly dispose of its chemical, biological, radiological, and other wastes at Fort Detrick, (b) to timely identify and investigate environmental contamination at Fort Detrick and threatened migration of hazardous substances off-site, and (c) to properly and promptly remediate on- and off-site contamination, as well as the United States' demands for access to and use of the Property, have resulted in substantial injury to Plaintiff.  The United States and its agents have disposed of chemical, biological, radiological, and other materials in unlined pits and other areas at Fort Detrick, resulting in contamination at Fort Detrick and off-site migration of hazardous substances, including migration onto Plaintiff's Property.  In the years since the initial contamination and migration, Defendant and its agents have failed to take appropriate action to prevent and remediate migration of hazardous substances.

3.      As a result of this combination of acts and omissions, Plaintiff has suffered indefinite delay in developing the Property, thus interfering with Plaintiff's use and enjoyment of the Property, diminishing the value of the Property, and causing Plaintiff significant lost business opportunities and

lost profits.  In addition, the threatened and actual migration of contaminants from Fort Detrick and the United States' belated and insufficient efforts to address such migration have resulted in physical harm to the Property, further interfering with Plaintiff's use and enjoyment of the Property and causing Plaintiff to incur significant investigative and response costs and to suffer diminution of property value and significant lost profits.

4.      The United States is liable for these injuries under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, which renders the United States liable "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action and over the parties pursuant to 28 U.S.C. §§ 1331 and 1346.

6.      Venue is proper in this Court because the acts and omissions complained of occurred in this judicial district.  *See* 28 U.S.C. § 1402(b); 42 U.S.C. § 9613(b).  Specifically, this Complaint alleges acts and omissions at Fort Detrick, located in Frederick, Maryland, as well as acts and omissions by the United States at the Property, also located in Frederick, Maryland.

7.      On March 25, 2013, Plaintiff filed a Standard Form 95, including an attached Statement of Claim for money damages under the FTCA, with the United States Department of the Army and the U.S. Army Garrison Fort Detrick, Maryland, in accordance with 28 U.S.C. § 2675(a) and 28 C.F.R. Part 14.

8.      More than six months having passed since Plaintiff  filed its administrative claim, and no final disposition of the claim having been made, the administrative claim may be deemed finally denied for purposes of 28 U.S.C. § 2675(a).

## PARTIES

9.      Plaintiff Waverley View Investors, LLC is a limited liability corporation organized under the laws of Maryland.  WVI's principal place of business is 1420 Beverly Road, Suite 300, McLean, Virginia, 22101.  WVI owns the Property at issue in this case.

10.      Defendant the United States of America, by and through its instrumentalities the Department of Defense, the U.S. Army, the U.S. Army Garrison Fort Detrick, Maryland, and their employees and officials – acting within the course and scope of their employment with Defendant – owns and operates Fort Detrick.  Fort Detrick is a U.S. Army Medical Command installation. Historically, Fort Detrick was the center of the United States biological weapons program.  Since the discontinuation of that program, Fort Detrick has hosted most elements of the United States biological warfare and defense programs.

## STATEMENT OF FACTS

### Description and History of the Property

11.      The Property consists of roughly 92.8 acres of land owned by Plaintiff WVI.

12.      The Property is located on the north and south sides of Shookstown Road, east and west sides of Waverley Drive, just south and west of Fort Detrick, and just north of The Golden Mile within The City of Frederick, Maryland.  The Property's street address is 1831 Shookstown Road, Frederick, Maryland 21702.

13.      The Property has obtained preliminary plan approvals, dated September 9, 2002 and April 6, 2005, and has obtained other approvals as a Planned Neighborhood Development for a residential development to be known as Waverley View.  The Property is zoned R-8, and, as such, is

approved and entitled to be subdivided into approximately 732 residential lots.  The Property was expected to be developed in two phases.

14.     WVI's predecessors in interest first acquired the Property on January 30, 2004, through a conveyance of approximately 90 acres.  Two smaller land parcels were acquired on June 29, 2006 and December 7, 2006, together comprising approximately 2.8 acres of land.  By Deed dated November 15, 2012, WVI acquired the Property encompassing approximately 92.8 acres from the U.S. Bankruptcy Trustee.

15.     Over the years since their initial acquisition of the Property, WVI and its predecessors have spent millions of dollars in engineering, planning, and other costs and fees required in order to obtain necessary approvals for the development of the Property.

16.     In the course of planning for development of the Property, WVI and its predecessors conducted extensive environmental sampling.  All sampling results were "clean" and provided no indication that the Property had been contaminated by hazardous substances that had migrated from Fort Detrick.  Relying on such sampling in 2004, WVI's predecessor, RGHGAB at Frederick, LLC, applied for a "No Further Requirements Determination" ("NFRD") from the Maryland Department of the Environment ("MDE") under the state's Voluntary Cleanup Program as an "inculpable person."  On September 3, 2004, MDE issued an NFRD.  While the NFRD prohibited use of groundwater beneath the Property, it otherwise found "no further requirements related to the investigation of controlled hazardous substances" at the Property, so long as the Property is used for limited residential, commercial or industrial purposes.

17.     The Property was inspected by qualified real estate appraiser Margo E. Pall, Associate of the CL Group, LLC on November 15, 2012 and was appraised as having a Market Value "As Is" of Twelve Million Eight Hundred Thousand Dollars ($12,800,000.00).

18.     Having been granted the above-referenced approvals, WVI was originally scheduled to begin development at the Property as early as the third quarter of 2013. However, as discussed further below, subsequent developments and conditions caused by Defendant which are related to off-site migration of hazardous substances from Fort Detrick have resulted in indefinite delay in, and uncertainty as to, the development of the Property.

### Historical Disposal Activities at Fort Detrick

19.     Fort Detrick comprises three non-contiguous tracts of real property, referred to as Areas A, B, and C. Area A occupies approximately 800 acres and contains office buildings, warehouses, laboratories, agricultural fields, family housing, and other military facilities. Area B, also referred to as "The Farm," occupies approximately 399 acres located about 0.5 miles west of Area A, and contains landfills, test areas, a disused skeet range, and other facilities. Area C consists of two small areas, approximately 16 acres in combined size, three miles east of Area A.

20.     The WVI Property abuts the south and southwest border of Fort Detrick Area B, and is immediately proximate to Area B-11, a sub-area within and along the southwestern perimeter of Area B.

21.     Disposal activities at Area B are described in the Federal Facility Agreement for Fort Detrick. *See generally* U.S. Army-EPA Federal Facility Agreement (2010) ("Federal Facility Agreement"), *available at* http://www.epa.gov/reg3hscd/super/sites/MDD985397249/ffa/Ft_Detrick_FFA_FINAL_SIGNED_1217 10.pdf (also attached to Plaintiff's administrative FTCA claim). Federal facilities are required to enter

into a Federal Facility Agreement with the U.S. Environmental Protection Agency ("EPA") if they are placed on the National Priorities List ("NPL") under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The Federal Facility Agreement establishes provisions and timetables governing site investigation and cleanup at each listed federal facility. Fort Detrick's Federal Facility Agreement specifically addresses the U.S. Army's obligations under both CERCLA and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, arising out of hazardous substance releases at Fort Detrick. It requires the Army, among other things, to implement Remedial Investigations and Feasibility Studies and to comply with procedures for selecting and carrying out remedial action at specified locations known as "Operable Units," including Area B Groundwater and chemical waste disposal pits at Area B-11. *See* Federal Facility Agreement, Appendix A.

22.     As described in the Federal Facility Agreement, Area B was historically used as "a proving ground in the Army's biological warfare program." Federal Facility Agreement §§ 6.3-6.4. It also served as the "primary location for Fort Detrick's waste management activities"; as such, it was used to dispose of such biological, radiological, and chemical materials as sterilized anthrax, radiological tracer materials, the lethal chemical agent phosgene, industrial waste, herbicides, and defoliants. *Id.* § 6.5.

23.     According to numerous U.S. Army reports, Area B-11 is believed to be the primary source of volatile organic compound ("VOC") contamination in Area B groundwater and surface water. *See*, *e.g.*, U.S. Army Corps of Engineers, *Area B-11 Disposal Pits: Engineering Evaluation and Cost Analysis*, p. 2-1 (Feb. 2000) ("USACE Feb. 2000 Report").

24.     While actively used as a disposal area, Area B-11 contained numerous unlined trenches and burial pits.  These pits were not systematically numbered, their locations were not accurately documented, and individual pits were used for a number of different waste disposal purposes.  Federal Facility Agreement § 6.4.

25.     Pits 1 through 7 within Area B-11 were used to dispose of metals, wood, and general waste from Fort Detrick.  Additionally, from 1970-76, the carcasses of laboratory animals were buried in Pit 3.  Dep't of the Army, Office of the Project Manager for Chemical Demilitarization and Installation Restoration, *Installation Assessment of Fort Detrick, Maryland – Record Evaluation Report No. 106*, p. II-3 (Jan. 1977) ("PM CDIR Jan. 1977 Report").

26.     Pits 8 through 10 within Area B-11 were used to dispose of refuse from the Fort Detrick family housing areas and bedding material from Fort Detrick's normal animal farm operations.  *Id.*

27.     Pit 11 within Area B-11 received "all types of acids and chemical waste from Fort Detrick, the U.S. Bureau of Standards, and Walter Reed Army Medical Center . . . from 1955 to 1970." USACE Feb. 2000 Report, p. 2-1.  By way of example, up to three 32-gallon garbage cans of chemical waste were disposed of in Pit 11 each week during Pit 11's use as a disposal area.  PM CDIR Jan. 1977 Report, p. II-3.  Additionally, eight 55-gallon drums of TCE were reported to have been buried in Area B, most likely in Area B-11 Pit 11, in 1968.  USACE Feb. 2000 Report, p. 2-1.  On information and belief, these drums of TCE are one source of the contamination to Plaintiff's Property.  In addition, two cylinders of phosgene may also have been buried in the area at an unknown date.  U.S. Army Corps of Engineers, *Fort Detrick Interim Removal Action Area B-11 Disposal Pits – Technical Closure Report*, p. 1-2 (Sep. 2004) ("USACE Sep. 2004 Report").

28.     Two pits within Area B-11, collectively referred to as Pit 12, were used to dispose of 150 tons of liquid waste in 1972, including 25 tons of sludge removed from decontamination holdings tanks at Area A.  PM CDIR Jan. 1977 Report, p. II-4.

29.     Pit 13 within area B-11 was used as a burial site for incinerated toxic waste from Fort Detrick's demilitarization operations.  *Id.*

30.     Pit 14 within Area B-11 received "large amounts" of herbicides and insecticide waste between 1965 and 1971.  *Id.*  In 1970-71 alone, Pit 14 received approximately 800 gallons of such liquid waste and 600 pounds of such solid waste.  *Id.*, Table II-3.

31.     Pit 15 within Area B-11 received waste from autoclaved, incinerated animal carcasses from Fort Detrick's biological agent testing program.  *Id.*, p. II-4.

32.     Pit 16 within Area B-11 reportedly received unknown amounts of radioactive carbon, sulfur, and phosphorous compound wastes between 1955 and 1971.  USACE Sep. 2004 Report, p. 1-2.

33.     With the termination of the government's offensive biological weapons program, the United States undertook a "decontamination and certification program at Fort Detrick" in 1970 and 1971.  Federal Facility Agreement § 6.6.  "[I]ncineration ash from the decontamination process was tilled into the soil in Area B's northwestern corner."  *Id.*  In addition, in 1977, buried scrap metals were uncovered as a result of soil erosion at Area B.  *Id.*

34.     At the time that the U.S. Army carried out the foregoing waste disposal activities in unlined trenches and pits in Area B-11 from the 1950s through the 1970s, the responsible Army officials knew or reasonably should have known that these wastes contained chemical and other hazardous constituents that would migrate off-site and adversely affect neighboring property owners, civilian residents, and the environment.  The releases of hazardous substances which are now threatening and

harming Plaintiff's Property are the direct result of Defendant's past waste disposal activities in Area B-11 at Fort Detrick, and Defendant's failure to timely investigate, abate, and remediate known and suspected contamination.  Furthermore, the foregoing waste disposal activities violated the Army's own mandatory regulatory duties, as alleged below in ¶¶ 67-71.

**Absence of Significant Remedial Action to Address Groundwater Contamination**

35.     Despite its awareness of the above activities and the obvious potential for contamination, the Army did not begin to investigate or evaluate contamination at Fort Detrick resulting from its historical disposal practices until November 1976, when the U.S. Army Office of the Project Manager for Chemical Demilitarization and Installation Restoration ("PM CDIR") initiated an Installation Contamination Assessment of Fort Detrick.  *See generally* PM CDIR Jan. 1977 Report.  The PM CDIR's report found that "[t]he records and historical operations suggest that Area B [wa]s contaminated with CBR [chemical, biological, and radiological] material," and "*that a high potential for contamination migration exists.*"  *Id.*, p. IV-1 (emphasis added).

36.     Following issuance of the PM CDIR's Installation Contamination Assessment report, an ad hoc U.S. Army review committee, composed primarily of representatives from the agencies responsible for both past and continuing activities at Fort Detrick, was convened to issue recommendations with respect to any additional field work.  With respect to Area B, the ad hoc committee expressly recommended against conducting "a preliminary survey . . . to assess the risk of migration of biological contamination or to detect migration of laboratory chemicals [from Fort Detrick]."  The committee instead recommended only that "existing wells and water courses be monitored for herbicides."  Memorandum from Frank A Jones, Jr., Colonel, re: "Contamination Assessment of Fort Detrick, Maryland" (Aug. 16, 1979).

37.     In making this recommendation against further action, the ad hoc committee made no reference to any of the mandatory authorities that governed the Army's conduct with regard to such environmental matters, discussed *infra* ¶ 68, and apparently ignored them.  The ad hoc committee did, however, acknowledge that its recommendations ran contrary to the conclusions and recommendations of the PM CDIR Records Research Review Team, which had found that "*contaminated wastes were disposed of in such a manner as to indicate a high potential for migration of hazardous materials beyond the boundaries of the installation*."  Memorandum for the Commander, re: Recommendations of the Fort Detrick Contamination Review Committee (U) (Aug. 19, 1977) (emphasis added).  The ad hoc review committee emphasized the "expensive and time consuming" nature of any follow-up survey, while noting that no migration had yet been detected despite the fact that "*the subterranean structure of Fort Detrick would allow rapid and easy migration*."  Fort Detrick Decontamination Review Committee Findings (Nov. 11, 1977) (emphasis added).

38.     The Office of the Army Surgeon General ("OASG") approved the ad hoc committee's findings in August 1979.  Memorandum from Frank A Jones, Jr., Colonel, re: "Contamination Assessment of Fort Detrick, Maryland" (Aug. 16, 1979).  In approving these recommendations, the OASG also made no reference to any of the mandatory authorities that governed the Army's conduct with regard to such environmental matters, discussed *infra* ¶ 68.

39.     In 1981, EPA Region III performed a Field Investigation of Uncontrolled Hazardous Waste Sites/Preliminary Assessment of Fort Detrick and concluded "that Area B may have been the disposal area for biological, chemical, radioactive, industrial, and munitions waste."  Federal Facility Agreement § 6.8; *see also* Field Investigations of Uncontrolled Hazardous Waste Sites, FIT Project, Task Report to the EPA, Contract No. 68-01-6056, *Preliminary Assessment of Fort Detrick* (1981)

("1981 Task Report to EPA").  Over three decades ago, in 1981, the EPA recommended that the State of Maryland and EPA monitor any Army investigations "to address the potential for off-site migration of toxic materials and to delineate the potential hazards related to the possible presence of anthrax cysts in the soil."  *Id*.

40.     Also in 1981, the Fort Detrick Director of Facilities and Engineering inexplicably represented to an EPA investigation team that "no problem exists at the Fort"; that, in his view, EPA's concerns about potential contamination at Fort Detrick were "blown out of proportion"; and that "[o]nly sanitary wastes were buried at Ft. Detrick."  1981 Task Report to EPA at Section 3, p. 2.  As discussed above, this last point was demonstrably false in light of the Army's own internal 1977 report to the Commander of Fort Detrick that there was a "high potential for migration of hazardous materials beyond the boundaries of the installation."

41.     In October 1982, representatives of the EPA and MDE conveyed to Fort Detrick officials their conclusion "that *human error in Fort Detrick safety procedures* may have allowed harmful levels of hazardous biological organisms and chemicals to be buried in Area B."  Universe Technologies, Inc., *Fort Detrick: Anthrax File Summary* (Mar. 2001), at 3 (emphasis added).

42.     However, despite such notice of contamination and the risk of off-site migration, until at least 1988, the United States conducted little, if any, documented activity to investigate the existence of and potential for off-site migration of contamination resulting from the historical disposal of chemical, biological, radioactive, or other wastes at Area B.  *See* Fort Detrick Final Area B-11 Chemical Waste Disposal Pits Decision Document (Jul. 2000) (describing the first serious investigation of contamination as having occurred in 1988).  In the early 1990s, Fort Detrick began performing quarterly sampling of groundwater wells in accordance with State Landfill permit requirements for Area B.  A February 1992

sampling event revealed TCE concentrations above Safe Drinking Water Act, 42 U.S.C. § 300f *et seq*.,

maximum contaminant levels ("MCL"), as well as elevated levels of trichlorofluoromethane ("TCFM")

in a well in Area B.  Federal Facility Agreement § 6.9.

43.    In October 1992, MDE also "sampled 21 residential wells in the vicinity of Fort Detrick

Area B and found TCE concentrations above the MCL in four wells" located along a roadway outside

Area B's southeastern edge.  *Id*. § 6.10; *see also* Environmental Management Division, Fort Detrick

Installation Action Plan (Mar. 2000), at 8.

44.    A number of documents related to proposed remedial investigation at Fort Detrick were

developed in the mid-1990s.  *See*, *e.g.*, U.S. Army Corps of Engineers, Final Site Health and Safety

Plan, Fort Detrick Remedial Investigation (May 1994); U.S. Army Corps of Engineers, Final Quality

Assurance Project Plan – Fort Detrick Remedial Investigation (May 1994); U.S. Army Corps of

Engineers, Final Sampling Design Plan, Fort Detrick Remedial Investigation (July 1994).  Many of

these documents include an overview of the historical chemical, biological, and radiological waste

disposal practices at Fort Detrick, and give no indication that these disposal practices were performed in

accordance with the mandatory authorities that governed the Army's conduct with regard to such

environmental matters, discussed *infra* ¶ 68.

45.    Additional sampling in the ensuing years produced further evidence of off-site migration

of VOCs, including TCE and perchloroethylene ("PCE").  For example, a May 1998 work plan

addendum revealed that TCE and PCE had been detected in concentrations of 5,000 µg/L and 20,000

µg/L respectively – exponentially higher than the MCLs of 5 µg/L for both TCE and PCE – in well

water and groundwater outside the southeastern boundary of Area B.  *See* U.S. Army Environmental

Center, Fort Detrick Remedial Investigation/Feasibility Study Work Plan Technical Addendum III (May

1998), at 2-1.  This addendum further admitted that "the elevated detections of TCE along the southwestern boundary of Area B suggest the possibility of contaminated groundwater off-site in the aquifer underlying the cultivated property to the south of Area B."  *Id.*  However, no remedial or removal action was taken in response to these sampling results.  Both TCE and PCE are "hazardous substances" under CERCLA, as are other contaminants which were disposed of at Area B.

46.     Between 1999 and 2000, TCE and PCE were again detected off-site, often in concentrations above MCLs, in wells at Robinson Spring and Hospital Spring, both located to the southeast of Area B.  PCE was also detected in a well located at 1990 Shookstown Road, to the east of the Property.  U.S. Army Corps of Engineers, Remedial Investigation Area B Water Sampling Data Report (Nov. 1999 – Feb. 2000).  Again, no remedial or removal action was taken in response to these sampling results.

47.     A 2000 report recognized a continued risk that groundwater contaminated with TCE and PCE, among other contaminants, could migrate or was migrating off-post as a result of Fort Detrick's historical disposal practices at Area B-11.  The report noted: "The buried materials in Area B-11 are assumed to be the source of the [TCE] and [PCE] detected in groundwater wells in Area B and off-site.  Contaminants in the vadose zone have the potential to migrate to groundwater and be transported to streams, including Carroll Creek, located downgradient of the site.  *Actual or impending releases of site-related contaminants, if not addressed by implementing the response action selected in this EE/CA, may present an unnecessary and avoidable risk in public health or welfare, and/or the environment.*"  USACE Feb. 2000 Report, at 1-1 (emphasis added).  But again, inexplicably, the Army took no remedial or removal action in response to these sampling results and the conclusions derived therefrom.

14

48.     Other sampling and investigations in the early 2000s continued to detect TCE and PCE in groundwater beyond the boundaries of Fort Detrick, in some cases in excess of MCLs.  The United States generally interpreted these test results as "suggest[ing] that the center of mass for the VOC plume is moving from west to east across Area B."  *See*, *e.g.*, Remedial Investigation, Area B, Water Sampling Report – May 2002, Final Sept. 2002.  The sampling data also revealed that "*because TCE was detected in a residential well located on the southeastern portion of Shookstown Road . . ., the plume may extend as far south as the location of this well*."  Federal Facility Agreement § 6.13 (emphasis added).

49.     Despite the above-referenced (and other) investigations, sampling events, and reports since the initial 1977 assessment – all of which continued to identify contamination, including contaminated groundwater, at Area B and nearby locations – Defendant took no measures to address this contamination or prevent and mitigate the threatened off-site migration of hazardous substances from Fort Detrick onto adjacent lands, including Plaintiff's Property.

50.     Between 2001 and 2004, the U.S. Army Corps of Engineers completed a limited removal action at Area B-11 to remove contaminated soil, chemical containers, compressed gas cylinders, and laboratory waste from the site.  *Id*. § 6.11.  This removal action revealed that numerous unmarked, unlabeled containers, drums, barrels, and other chemical, biological, and/or radiological waste receptacles had been buried within Area B-11.  Vials containing live pathological bacteria were also revealed to have been disposed of at the site.  *Id*. § 6.16.1.  "Soil samples from the bottom of the pit excavations contained TCE, PCE, and polychlorinated biphenyls (PCBs).  According to the Army, the excavated areas were backfilled with clean soil, and the entire area was covered with clean soil and seeded."  *Id*.  However, "[b]ecause of the potential of finding live biological materials in other disposal

areas, a prohibition on future intrusive activities in waste areas was instituted due to the complex safety requirements and associated costs." *Id*.

51.     The 2001-2004 limited removal action did not include any action to address the identified contaminated groundwater.  Nor did Defendant undertake any other action to remediate continuing migration of hazardous substances in groundwater.  Thus, Defendant failed to take prompt remedial action as required under applicable Defense Department mandatory authorities, *see infra* ¶ 68, despite Defendant's knowledge that hazardous substances had migrated off-site at least since 1992.

52.     To date, despite Defendant's undeniable notice of groundwater contamination, no action has yet been taken to remediate past and continuing groundwater contamination caused by Defendant's disposal of contaminants at Fort Detrick.  The migration of contaminants as a result of Defendant's historical waste disposal practices at Fort Detrick, including Defendant's disposal of VOCs in Area B-11, and Defendant's failure to prevent and remediate migration of contaminants to the Property, are in violation of the mandatory authorities governing the Army's conduct with regard to such matters, discussed *infra* ¶¶ 67-71, and have resulted in continuing injury to Plaintiff.

<u>**Government Demands for Access to the Property**</u>

53.     Fort Detrick Area B Ground Water was added to the CERCLA National Priorities List in April 2009.  *See* 74 Fed. Reg. 16,121 (Apr. 9, 2009).  As a result of this listing, since February 2008, "the Army has been partnering with the MDE and EPA to form consensus on data gaps and additional fieldwork that will be required to define the nature of the groundwater flow beneath Area B and to complete [a Remedial Investigation]."  Federal Facility Agreement § 6.16.14.  Pursuant to a July 2010 work plan for the Remedial Investigation, the Army plans to conduct additional sampling for potential contaminants not previously studied.  *Id*.

16

54.     As part of the remedial investigation, the Army and one or more of its contractors have entered onto Plaintiff's Property in order to install groundwater monitoring wells and perform additional sampling.

55.     On or about February 8, 2013, after obtaining all of the necessary approvals for the Property's development, and at the time of scheduled hearings before officials of The City of Frederick to obtain certain final approvals for the development of the Property, Plaintiff received a letter from EPA.  *See* Letter from Paul Leonard to John W. Anderson, Re: Fort Detrick Area B Superfund National Priority List (NPL) Site, Frederick Maryland, U.S. Army request for Access to Sample at 1831 Shookstown Road (Waverley Property) (Feb. 8, 2013).  This letter "strongly urge[d]" (under threat of penalties and sanctions should Plaintiff not acquiesce) that Plaintiff consent to federal government access to the Property to undertake groundwater sampling.  *Id.*  EPA made this demand despite the fact that Plaintiff's predecessor had been informed in 2004 by MDE that no further investigation of controlled hazardous substance contamination was necessary at the Property.

56.     EPA's letter asserted that groundwater sampling on the Property was "necessary and appropriate to better understand the nature and extent of contamination migrating from the Fort Detrick Area B Superfund NPL site."  *Id.*  The February 8, 2013 letter from EPA specified that several VOCs, including TCE, PCE, and chloroform, had all been found along the boundary of Area B at levels substantially in excess of MCLs, and further described Plaintiff's Property as "immediately adjacent to the Area B-11 trenches, where contaminated groundwater has been detected flowing in the direction of [Plaintiff's] property."  *Id.*

57.     In the letter, EPA expressed its belief, and that of the Army, "that it is likely that the groundwater contaminant plume extends beneath your property."  *Id.*  This belief – never before

17

conveyed to Plaintiff or its predecessors − was based at least in part on EPA's recognition of "the karst nature of the hydrogeologic system underneath Area B and vicinity, which allows groundwater to migrate readily in any direction." *Id*. This recognition of the ease with which groundwater beneath Area B could migrate echoed the 1977 PM CDIR's and ad hoc review committee's earlier internal acknowledgment of this fact.  However, in the subsequent 35 years, the Army had taken no action to investigate potential migration of contaminants to the Property, or to prevent and remediate such migration.

58.     The February 8, 2013 EPA letter resulted in a series of meetings and conversations between Plaintiff and representatives of the Army and Army Corps of Engineers and their respective consultants, and with EPA and MDE, so that Plaintiff could better understand the technical issues implicated by the Army's ongoing and planned investigations of contamination migrating from Area B-11.  Plaintiff also requested information about the scope and duration of the Army's sampling and investigation at Plaintiff's Property.  Plaintiff was told by the Army and EPA representatives that the investigation's duration would be open-ended and that it could be extended for decades.  Pursuant to EPA's February 8, 2013 demand letter, the Army and its contractors have entered onto Plaintiff's property to conduct groundwater sampling.  Initial sampling results, received on January 27, 2014, reveal the presence of PCE, TCE, 1,1-Dichloroethylene, and chloroform in groundwater at the Property at levels in excess of federal MCLs – and, in the case of TCE, at levels 14 – 42 times the MCL.

## Impacts of Government's Acts and Omissions

59.     Defendant the United States failed to investigate the existence of contamination at, and potential for off-site migration of hazardous substances from, Fort Detrick until more than three decades after the risk of such contamination and migration was first raised to and acknowledged by the Army in

the internal August 19, 1977 Memorandum for the Commander.  The improper waste disposal practices and the failure to timely respond to this contamination and threatened and actual migration have both violated numerous mandatory duties of the United States and resulted in significant harm to Plaintiff and Plaintiff's Property.  The contamination and threatened and actual migration have frustrated and impeded Plaintiff's desired use and development of the Property, resulting in substantial impairment to the Property's economic value.

60.     For example, Plaintiff has been contacted by multiple builders interested in purchasing available lots in Plaintiff's planned project. However, all of these prospective builders have made purchase offers markedly below the appraised value of the Property, declined to enter into purchase agreements with Plaintiff, or ultimately terminated agreements they had entered into, in many cases explicitly citing concerns about environmental issues at the Property.

61.     Due to the United States' earlier actions and inactions and the continuing actual and suspected contamination at or near the Property, all or part of the most current appraised value of the Property ($12,800,000.00 in 2012) has been, or is likely to be, lost.

62.     In addition, Plaintiff has been forced to pay private consultants to monitor for off-site migration of contaminants from Fort Detrick.

63.     Plaintiff's costs to date as a result of the United States' acts and omissions include:

| | | |
|---|---|---|
| a. | Testing groundwater and environmental media: | $113,000.00 |
| b. | Environmental Consulting: | $ 26,000.00 |
| c. | Legal costs re: defendant's access demand and related issues: | $178,000.00 |

As the injuries to Plaintiff and the Property continue, these costs continue to rise as well.

64.     The loss of the value of the Property and Plaintiff's out-of-pocket costs together equal or exceed Thirteen Million One Hundred and Seventeen Thousand Dollars ($13,117,000).

65.     Moreover, Plaintiff has suffered and will continue to suffer lost profits and business opportunities, carrying costs, and other damages of not less than $24.3 million.  Hence, Plaintiff's total damages are not less than $37 million.

## Defendant's Violation of Mandatory Duties

66.     The federal government is shielded from liability under the FTCA for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . , whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

67.     The performance (or non-performance) of functions related to the disposal of chemicals and other wastes, and of functions related to the investigation and remediation of contamination caused by waste disposal activities at Fort Detrick, implicate non-discretionary duties and thus do not fall within this exception to FTCA liability.

68.     More specifically, by improperly disposing of hazardous substances (including large quantities of VOCs and other harmful chemical, biological, and radiological contaminants) in unlined trenches and pits, whether by burying these contaminants in containers from which they could be expected to leak and migrate (including at least eight 55-gallon drums of TCE in 1968) or by dumping them directly into the ground, unlined pits, and other recorded and unrecorded locations at Fort Detrick Area B; by failing to sterilize, treat, or otherwise decontaminate many of these contaminants prior to their burial or disposal; by failing to promptly investigate and take remedial measures to prevent possible or actual off-site migration of these hazardous substances; and by failing to prevent and remediate suspected off-site migration of these hazardous substances from Fort Detrick, the United

States has acted in violation of one or more non-discretionary duties, including, but not limited to the following requirements:

(a)     The requirement that the Defense Department's "*installation activities must not adversely affect neighboring civilian populations or the environment.*"  32 C.F.R. § 263.3(e)(1) (1965) (DoD Directive 5500.5) (emphasis added).

(b)     The requirement that Army policies and procedures comply with Executive Order 11258, "Prevention, Control and Abatement of Water Pollution by Federal Activities," November 17, 1965.  *Id*. at 850 (DoD Directive 5100.50, Section IV(C)).  Under this requirement, all installations must "provide secondary treatment, or its equivalent, for all wastes except cooling water and fish hatchery effluents."  E.O. 11258 (Nov. 7, 1965), Sec. 4(a).; *see also* E.O. 11288, 31 Fed. Reg. 9,261 (July 2, 1966), Sec. 4(a) (same).

(c)     The requirement that pollution by military installations, facilities, or buildings "shall be controlled," and to "*take positive action* to accelerate the pace of corrective measures *to eliminate environmental pollution*."  31 Fed. Reg. 849 (Jan. 21, 1966) (DoD Directive 5100.50, Sections IV(A), (B) (emphasis added).

(d)     The requirement that the Secretary of the Army affirmatively "[i]dentify environmental pollution problems at all installations and take corrective measures" and "[i]nstitute necessary measures to monitor environmental pollution abatement control methods to assure that [they] maintain the required degree of pollution control."  *Id*. at 850 (DoD Directive 5100.50, Sections V(D)(1), (3)).

(e)     The requirement that "no waste shall be disposed of or discharged in such a manner as could result in the pollution of ground water which would endanger the health or welfare of the public."  E.O. 11507, 35 Fed. Reg. 2,573 (Feb. 4, 1970), Sec. 4(a)(5).

(f)     The requirement that all Department of Defense components "[p]rovide monitoring and evaluation of all facilities to assure that environmental standards are met on a continuing basis." DoD Instruction 4120.14, "Environmental Pollution Prevention, Control and Abatement" (Aug. 30, 1977), § C(1).

(g)     The requirements included in both historical and current versions of Army Regulation ("AR") 200-1, "Environmental Protection and Enhancement," as well as its predecessor regulations, including Army Regulation 11-21 (Nov. 3, 1967), and associated Army directives and materials.  These requirements include, though are not limited to:

### Under the 1975 Army regulations

(i)     A requirement that wastes be "either recycled and reclaimed or *confined and contained so they will not migrate* to re-emerge in pollutant form."  40 Fed. Reg. 55,962, 55,964 (Dec. 2, 1975) (promulgating 32 C.F.R. § 650.6) (emphasis added).

(ii)     A prohibition against the "disposal (by open dumping, water dumping, well injection, or open burning) of pesticides, hazardous chemical stocks, pharmaceutical stocks and drugs, radioactive materials, explosive ordnance, or chemical warfare agents directly into the air, water, or land environment in a manner hazardous to man or animals or if it will cause unreasonable adverse effects on the environment (§ 650.127(f))."  *Id*. at 55,988 (promulgating 32 C.F.R. § 650.124(j)).

(iii)    A requirement that all Army activities take "*[a]ll measures to prevent accidental pollution of the environment by uncontrolled release of hazardous chemicals to the air, water, or land environment.*"  *Id.* (promulgating 32 C.F.R. § 650.131(a)) (emphasis added).

(iv)    A requirement that "[n]o hazardous chemical, or its container, which will cause adverse effects on the environment, will be used or disposed of in a manner inconsistent with instructions on its label or inconsistent with use or disposal procedures established by Federal, State or local laws or regulations."  *Id.* at 55,991 (promulgating 32 C.F.R. § 650.131(d)); *see also id.* at 55,989 (promulgating 32 C.F.R. § 650.125(e)(6)) (requiring that installation and activity commanders "[d]ispose of hazardous and toxic materials in accordance with EPA-approved and DA-approved procedures (§§ 650.126-650.138)").

(v)    A requirement that "[c]ommanders of installations and activities who are responsible for disposing of hazardous chemicals will maintain records indicating quantities of hazardous chemicals disposed of, disposal method used, and disposal site location . . . ."  *Id.* at 59,991 (promulgating 32 C.F.R. § 650.131(e)(4)).  In addition, "[i]nstallation commanders will report, as required, on the inventory, use, and disposal of hazardous chemical stocks, on recurring reports under the NPDES, and as required on accident/incident reports required by AR385-40 and AR 50-21."  *Id.* (promulgating 32 C.F.R. § 650.134).

<u>*Under the 1977 Army regulations*</u>

(vi)    A requirement that "[s]torage facilities for materials which are hazardous to health, and for oils, gases, fuels, or other materials capable of causing water pollution, to either surface or ground waters, if accidentally discharged, will be so located as to minimize or prevent such spillage. Measures necessary to entrap spillage, such as catchment areas, relief vessels, or entrapment dikes, will

23

be installed so as to prevent and/or contain accidental pollution of water (Subparts F and I of this part)."

42 Fed. Reg. 65,026, 65,045 (Dec. 29, 1977) (promulgating 32 C.F.R. § 650.62).

(vii)    A requirement that waste disposal operations "meet environmental pollution standards," that wastes be disposed of "consistent with Army waste disposal requirements" in Army Regulation 420-47, and that wastes "*not* be disposed of by open dumping."  *Id*. at 65,051 (promulgating 32 C.F.R. § 650.110(a), (c)) (emphasis added);

(viii)    Requirements also contained in the 1975 regulations.  *See*, *e.g.*, *id*. at 65,053-56 (promulgating 32 C.F.R. §§ 650.124(j), 650.126(e)(6), 650.131(a),(d)), 650.133, 650.1344).

### *Under the 1982 Army regulations*

(ix)    A requirement that the Army "will . . . [c]ontrol or eliminate all sources of pollutants to surface or ground water by conventional treatment systems or by employing alternative or innovative processes."  AR 200-1, "Environmental Quality – Environmental Protection and Enhancement," (June 15, 1982), § 3-3(b).

(x)    A requirement that major Army commanders and State Adjutants General "[i]dentify, quantify, and report all sources of water pollution [and] take proper action to eliminate or reduce them to acceptable levels."  *Id*., § 3-4(c)(1).

(xi)    A policy "[t]o abate off-post migration of contaminants" and "[d]econtaminate property that has been excessed for disposal."  *Id.*, §§ 3-12(a)(1)-(2).

(xii)    A requirement that "Army activities will take all measures needed to prevent pollution of the environment by release of hazardous chemicals to the air, water, or land."  *Id.*, § 5-6(a).

(xiii)    A requirement that "[s]torage facilities for chemicals hazardous to health and welfare, and detrimental to the environment, will be constructed and operated according to regulations

found in 29 CFR 1910, its amendments, and other applicable regulations," and that storage data

including the compatibility of chemicals, ventilation, fire walls, containment, and protection from the

elements be considered.  *Id*., § 5-6(b).

<u>Under the 1997 Army regulations and associated directives</u>

(xiv)     A requirement that all active Army installations "[s]creen[] for past use of

hazardous substances and the potential for contamination (or reassessment, if appropriate)."  AR 200-1,

"Environmental Quality – Environmental Protection and Enhancement," (Feb. 21, 1997), § 11-9(a).

(xv)     A requirement to conduct all Installation Restoration Program sites "in

accordance with the Installation Action Plan . . . approved by the IC."  *Id*. § 11-9(b).

(xvi)     A requirement that the DASA(ESOH) "approve all off-site response actions"

when off-site migration is suspected.  DA PAM 200-1 (Jan. 17, 2002), § 11-14(b)(1) (citing AR 200-1

(Feb. 21, 1997), § 11-10); *see also* USAEC, "Installation Restoration Program Management Plan,"

(Mar. 1999), § 7.3.

<u>Under the 2007 Army regulations</u>

(xvii)     Army Regulation 200-1, which addresses "Environmental Protection and

Enhancement," including the subject of "Environmental Cleanup."  Section 2-3 specifically notes that

"*this regulation prescribes program requirements in terms of 'will' and 'must,' which mean that the

actions are mandatory*."  AR 200-1 (Dec. 13, 2007), (emphasis added).

(xviii)     A requirement to "[d]etermine contamination migration.  Garrison

commanders . . . must approve off-site data collection and any off-post monitoring to *ensure that

contamination has not migrated off-site*."  AR 200-1 (Dec. 13, 2007), § 12-4(a)(5) (emphasis added).

(xix)     A requirement to "[c]onduct screening for past use of hazardous substances, pollutants and contaminants and the potential for contamination (or reassessment, if appropriate)" at all active installations, and to "[c]onduct studies and response actions in accordance with the annual IAP." *Id.*, §§ 12-4(b)(5)(a)-(b).

69.     The United States has also acted in violation of non-discretionary duties in its failure to comply with timelines and other requirements applicable to its remediation efforts pursuant to CERCLA.  As stated above, Area B groundwater was listed on the National Priorities List as of April 2009.  CERCLA section 120(e)(1) requires commencement of a remedial investigation and feasibility study within six months of such listing.  42 U.S.C. § 9620(e)(1).  However, remedial investigation of groundwater at Area B was not commenced until July 29, 2010, more than six months after the site's listing.  *See* EPA, "Cleanup Activities at FORT DETRICK AREA B GROUND WATER," http://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.CleanupActs&id=0304606 (last visited May 7, 2014).  Such failure to comply with CERCLA's statutory deadline for taking action is a violation of a non-discretionary duty.  *See* 6 *Legislative History of the Superfund Amendments and Act of 1986* 5327, 5329 (1990) ("[The] timetables, standards and requirements [under the federal facilities provisions of the 1986 Superfund Amendments] are enforceable under the citizens' suits provisions of the legislation *as nondiscretionary duties of the Federal Government*." (emphasis added)).

70.     To the extent that other timetables or requirements established pursuant to Work Plans required by the Federal Facility Agreement have been violated, these too are violations of non-discretionary duties.  *See* Federal Facility Agreement § 23 (describing enforceable nature of the agreement and all standards, conditions, and requirements incorporated thereunder).

71.     Further, to the extent that the United States' acts (and omissions) with respect to the disposal and management of chemical, biological, radiological, and other wastes and the investigation and remediation of migration were in any sense discretionary, these activities do not implicate the economic, social, or policy-based decision-making of the type that Congress meant to shield from FTCA suit.

## COUNT I - NEGLIGENCE

72.     Plaintiff re-alleges and incorporates herein the allegations in Paragraphs 1 through 71 as if fully set forth herein.

73.     Defendant the United States and its agents and employees owed a duty to occupants of land adjacent to Fort Detrick to use reasonable care when conducting activities on the land so as to avoid causing harm to the neighboring land, including Plaintiff's Property.

74.     By disposing of chemical, biological, radiological, and other contaminants in unlined pits, landfills, and other locations at Fort Detrick, and through their continuing failure to prevent and timely investigate, abate, and remediate the migration of contaminants from Fort Detrick to the Property, Defendant the United States and its agents and employees have negligently breached a duty of care to Plaintiff, a neighboring landowner.

75.     As a proximate result of this breach, Plaintiff has suffered damages, including but not limited to physical harm to Plaintiff's Property, remedial and investigative costs, diminution in the value of the Property, and lost profits due to inability to proceed with development in light of the contamination and the United States' belated efforts to investigate and remediate the contamination.

## COUNT II - TRESPASS

76.     Plaintiff re-alleges and incorporates herein the allegations in Paragraphs 1 through 75 as if fully set forth herein.

77.     At no time did Plaintiff consent to the migration of contaminants from Fort Detrick to the Property or any other intrusion on its property.

78.     By causing chemical, biological, radiological, and other contaminants to enter the Property without Plaintiff's consent, by failing to remove or remediate such contamination, and by other intrusions, Defendant the United States and its agents and employees have interfered with and continue to interfere with Plaintiff's exclusive possessory interests in the Property.  This trespass has resulted in harm to Plaintiff's Property, has forced Plaintiff to incur costs to investigate suspected contamination, has caused diminution in the Property's value, and has resulted in lost profits due to inability to proceed with developing the Property.

## COUNT III – PRIVATE NUISANCE

79.     Plaintiff re-alleges and incorporates herein the allegations in Paragraphs 1 through 78 as if fully set forth herein.

80.     By disposing of chemical, biological, radiological, and other contaminants in such a way as to contaminate the Property (and threaten future contamination of Plaintiff's property), and by failing to prevent or abate the migration of contamination to the Property, Defendant the United States and its agents and employees have unreasonably and substantially interfered with Plaintiff's use and enjoyment of the Property, causing Plaintiff to suffer damages including physical harm to Plaintiff's property, remedial and investigative costs, diminution in the value of the Property, and lost profits due to inability to proceed with developing the Property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff WVI respectfully requests that the Court award Plaintiff:

1.      Compensatory damages against Defendant the United States, in the amount of Thirty-Seven Million, One Hundred and Ninety-Nine Thousand, Four Hundred and Eighty-Eight Dollars ($37,199,488.00);

2.      Its reasonable costs and attorneys' fees; and

3.      Post-judgment interest as allowed by law.

Respectfully submitted,

*/s/*_____
Kirsten L. Nathanson (Bar Number 14236)
knathanson@crowell.com

Clifford J. Zatz (*pro hac vice* motion to be submitted)
czatz@crowell.com

R. Timothy McCrum (*pro hac vice* motion to be submitted)
rmccrum@crowell.com

Dawn K. Miller (*pro hac vice* motion to be submitted)
damiller@crowell.com

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel 202-624-2500
Fax 202-628-5116

May 8, 2014