**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| WAVERLEY VIEW INVESTORS, LLC | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-14-1527 |
| | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |

## MEMORANDUM

Plaintiff Waverley View Investors, LLC ("Waverley") sues the United States under the

Federal Tort Claims Act ("FTCA") for negligence, trespass, and private nuisance arising out of

the United States Army's waste disposal and remediation practices at Fort Detrick, which have

contaminated groundwater beneath Waverley's land.  The United States filed a motion to dismiss

for lack of subject matter jurisdiction on the grounds that Waverley's claims fall within the

FTCA's discretionary function exception ("DFE").  The court held a hearing on the motion on

December 15, 2014.  For the reasons stated below, the motion to dismiss will be granted.

## BACKGROUND

This lawsuit arises out of groundwater contamination caused by hazardous chemicals that

have migrated from Fort Detrick.  Specifically, Waverley alleges the United States' waste

management practices at Fort Detrick caused the levels of trichloroethylene ("TCE"),

tetrachloroethlyene ("PCE"),[1] and dichloroethlyene ("DCE") on Waverley's land to exceed

federal maximums, (Pl.'s Opp'n Ex. 10, Tonkin & Hennet Decl. ¶ 10, ECF No. 23-11), thereby

delaying and ultimately precluding Waverley from developing its land.  Waverley now seeks

$37.2 million in compensatory damages.  A summary of relevant facts follows.

---

[1] The United States uses "PCE" to refer to perchloroethlyene.  The parties place no apparent emphasis on this difference.

Fort Detrick became home to the United States' biological weapons program during World War Two. During that war, the military began investigating, developing, and testing various biological agents at Fort Detrick. (Def.'s Mot. Dismiss Ex. 1, Curtis Decl. ¶ 9, ECF No. 18-4.) This program stopped, however, in 1969, when President Nixon renounced offensive biological warfare and directed the Department of Defense ("DoD") to dispose of existing biological weapons stocks. (*Id.* ¶ 10.) Since then, Fort Detrick has focused on biomedical research and development, medical logistics, materiel management, and telecommunications. (*Id.*) Today, Fort Detrick remains an active Army installation occupying 1,146 acres within the city limits of Frederick, Maryland. (Def.'s Mot. Dismiss Ex. 5, Gortva Decl. ¶ 4, ECF No. 18-8.)

The part of Fort Detrick at issue here is a 399-acre parcel of land called Area B, which is separated from the fort's main operations area. (*Id.* ¶ 6.) Area B was the locus of Fort Detrick's biological testing and—important for the purposes of this litigation—its waste management practices. (*Id.*) The Army disposed of all kinds of waste in Area B. And, in doing so, the Army used standard industry practices: it separated contaminated from conventional solid waste; divided solid waste into burnable and nonburnable wastes, the former going to incinerators and the latter to landfills; and sent liquid waste into a separate sewer system. (Curtis Decl. ¶ 11.)

Within Area B, the Army set up waste pits in which it buried various nonburnable wastes. The specific waste pits at issue here are in a subsection called Area B-11, which lies on Area B's—and the fort's—edge. Area B-11 is also next to Waverley's land. (Pl.'s Opp'n Ex. 1, Anderson Decl. ¶ 11, ECF No. 23-2.) In Area B-11, the Army disposed of various acids and chemicals, including the TCE and PCE at issue here, from 1955 to 1970.[2] (Curtis Decl. ¶¶ 12,

---

[2] The Army also disposed of other wastes in Area B-11, including sterilized anthrax; *Escherichia coli*; radioactive carbon, sulfur, and phosphorous; phosgene; liquid sludge; herbicides and insecticides; and autoclaved, incinerated animal carcasses. (*See* Pl.'s Opp'n Ex. 15, Federal Facility Agreement for Fort Detrick ("Federal Facility Agreement"), at 9-11, ECF No. 23-16.)

17.)  The chemicals the Army buried in Area B-11 were "integral tool[s]" in advancing the military's mission.  (*Id.* ¶ 13.)  The Army used TCE to degrease metal parts and help freeze biological warfare agents.  (*Id.*)  And the Army used PCE to decontaminate clothing that had been exposed to anthrax and to neutralize organisms used in biological warfare simulants.  (*Id.*)

The pits in Area B-11 were dug about 15 feet deep, 12 feet wide, and 20 feet long and treated with fluorescein dye to track water flow.  (*Id.* ¶ 17.)  At the time, "it was common practice to dispose of wastes in unlined landfills."  (Def.'s Mot. Dismiss Ex. 18, Defense Environmental Restoration Program Annual Report to Congress (2000) ("2000 Annual Report"), at 4, ECF No. 18-21.)  The pits in Area B-11 were likewise unlined.  (Federal Facility Agreement § 6.4.)  Moreover, the pits were neither systematically numbered nor accurately documented.  (*Id.*)  The Army appears to have stopped using disposal areas in the southwest part of Area B, including Area B-11, by 1972.  (Curtis Decl. ¶ 16.)

In the early 1970s, the Department of Defense was not legally required to address environmental problems caused by past military operations.  (2000 Annual Report, at 3-4.)  In 1975, however, it decided to begin "working to clean up the environment and protect human health" at military installations nationwide through what was called the Installation Restoration Program ("IRP").  (*Id.*)  That same year, the Army began publishing Army Regulation 200-1, which "provide[d] general guidance to elements within the Department of the Army on environmental protection" and "prescrib[ed] policies, responsibilities, and procedures for the protection and preservation of environmental quality for the Department of the Army in peacetime."  (Def.'s Mot. Dismiss Ex. 26-1, Army Regulation 200-1 (1975), ECF No. 18-32.)

In 1977, the Army conducted an initial assessment of contamination at Fort Detrick.  (*See* Pl.'s Opp'n Ex. 12, Installation Assessment of Fort Detrick (1977), ECF No. 23-13.)  This began

3

with an "onsite records search" that looked for "indications of possible contamination by chemical, biological[,] radiological and industrial materials resulting from past research[,] testing, storage, demilitarization and disposal operations." (*Id.* at 1.) The authors of the records search concluded that "[t]he records and historical operations suggest that Area B is contaminated with CBR [chemical, biological, and radiological] material" and that an ad hoc committee be formed to make recommendations for further action. (Def.'s Mot. Dismiss Ex. 2, Record Evaluation Report No. 106 (1977), at iv, ECF No. 18-5.) The committee reviewed the report but recommended against a more elaborate "preliminary survey" at Area B, in part because it was not yet "obligatory . . . to certify beyond question that there is no CBR contamination at Fort Detrick . . . ." (Installation Assessment of Fort Detrick (1977), at 2.) The committee also recognized that conducting a preliminary survey would "present special difficulties" and that "extreme caution" was necessary to protect the public from drilling operations, which could release hazardous substances into the environment. (*Id.* at 4, 5.)

In 1980, Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), which "require[d] responsible parties to clean up releases of hazardous substances to the environment." (2000 Annual Report, at 4.) In 1986, the Superfund Amendments and Reauthorization Act ("SARA") expanded CERCLA and formally established the Defense Environmental Restoration Program ("DERP"), which continued the efforts begun by the Installation Restoration Program. (*Id.*) In recognition of the complexity of the task facing the federal government,[3] SARA included a CERCLA regulation clarifying that the federal government's responses to a particular environmental hazard were "discretionary governmental functions" and that CERCLA did not "create any duty of the federal government to take any

---

[3] As of 2007, there were 31,000 sites under consideration nationwide. (Def.'s Mot. Dismiss Ex. 19, Defense Environmental Programs Annual Report to Congress (2007) ("2007 Annual Report"), at 10, ECF No. 18-22.)

response action at any particular time." 40 C.F.R. § 300.400(i)(3) (originally found at 40 C.F.R. § 300.61(e)(3) (1986)).  DERP established a multiple-step process for the "identification, investigation, and cleanup of contamination and military munitions associated with past activities at DoD facilities . . . ." (2007 Annual Report, at 9.)

In 1981, an EPA contractor conducted a preliminary assessment of Fort Detrick.  (*See* Pl.'s Opp'n Ex. 17, Preliminary Assessment of Fort Detrick (1981), at § 2, ECF No. 23-18.)  The assessment concluded that, even though the "potentially contaminated areas" were no longer in use, "they can't be certified as clean."  (*Id.*)  The assessment also noted that "Fort Detrick is presently installing a monitoring well network to determine if any toxic materials are migrating." (*Id.*)  The assessment recommended that, going forward, "the State and EPA monitor the Army's investigations."  (*Id.*)

The Army continued to monitor Fort Detrick's environmental situation into the 1990s.  In 1991, monitoring wells detected TCE contamination at Area B, which prompted the restoration effort that continues to this day.  (Gortva Decl. ¶ 7.)  In 1992, a preliminary site inspection conducted by the Army Corps of Engineers identified five landfill areas as "waste sources with potential to release."  (Def.'s Mot. Dismiss Ex. 7, Preliminary Site Inspection (1992), at 67, ECF No. 18-10.)  The Army Corps of Engineers recommended more soil and surface water sampling. (*Id.*)  Later that year, the Maryland Department of the Environment found TCE contamination in residential wells near Fort Detrick.  (Federal Facility Agreement § 6.10.)  The Army immediately provided an alternative water source to affected residents.  (Gortva Decl. ¶ 11.)

The Army continued to conduct fieldwork to identify the scope of contamination in and around Fort Detrick until 1997, when the Army confirmed that Area B-11 was the primary source of TCE and PCE contamination.  (Id. ¶¶ 13-15.)  The Army completed a draft remedial

investigation in 1998.  (Def.'s Mot. Dismiss Ex. 9, Area B-11 Chemical Waste Disposal Pits

Decision Document (2000), at § 2.2.1, ECF No. 18-12.)  In 2000, recognizing "the elevated

levels of [TCE] and [PCE] in the groundwater near . . . Area B-11[,]" the Army decided to

conduct an interim removal action that would "remove the primary source of the groundwater

contamination in Area B, thereby preventing future releases."  (*Id.* at §§ 1.3-1.4.)  The Army's

decision document analyzed three "removal alternatives" for addressing Area B-11

contamination and ultimately chose to use soil freezing, excavation, and off-site incineration to

contain the waste pits.  (*Id.* §§ 2.9, 2.11.1.)  The interim removal action, which began in 2001,

was complex, requiring containment tents, freeze walls, and the removal of thousands of tons of

contaminated soil.  (Def.'s Mot. Dismiss Ex. 11, Fort Detrick Interim Removal Action Area B-

11 Disposal Pits Technical Closure Report, at §§ 1.0, 1.3, ECF No. 18-14.)  As a result, the

action cost $25 million and was not completed until 2004.  (Gortva Decl. ¶ 25.)  But the action

succeeded in reducing TCE and PCE concentrations in the groundwater in Area B.  (*Id.* ¶ 26.)

    With the interim removal action completed, the Army continued to monitor groundwater

in Area B, but decided to institute a "prohibition on future intrusive activities" because of the

"complex safety requirements and associated costs."  (Federal Facility Agreement § 6.11.)  The

Army continued to consider its options and eventually decided to install landfill caps that would

prevent further groundwater contamination.  (Gortva Decl. ¶ 33.)

    In 2009, the EPA placed Fort Detrick's Area B on the National Priorities List, which

meant EPA, instead of the Maryland Department of the Environment, would be responsible for

leading Area B's remediation.  (*Id.* ¶¶ 34-35.)  The Army and the EPA entered into a Federal

Facility Agreement, which outlined their respective responsibilities in this process.  To this day,

the Army continues to conduct its remedial investigation of Area B.  (*Id.* ¶¶ 45-48.)

In 2012, Waverley bought the 92.8-acre parcel of undeveloped land next to Area B-11. (Anderson Decl. ¶ 5.)  It did so with the intention of creating a residential development there. (*Id.* ¶ 9.)  Though it was aware of contamination concerns near Fort Detrick when it bought the land, Waverley knew the Maryland Department of the Environment had issued a "No Further Requirements Determination" regarding the land.  (Id. ¶¶ 10-14.)  But groundwater testing conducted by the Army in January 2014 revealed that Waverley's land had been contaminated by TCE and PCE at levels far exceeding federal maximums.  (*Id.* ¶ 16.)

On May 8, 2014, Waverley filed this lawsuit against the United States.  The United States filed a motion to dismiss for lack of subject matter jurisdiction, citing the discretionary function exception to the FTCA.  Waverley opposed this motion, claiming the Army's past waste disposal practices in Area B-11 and its past and present waste remediation efforts at Fort Detrick violated a variety of provisions that allegedly bound the Army to a specific course of conduct.  This court held a hearing on the motion on December 15, 2014.

## STANDARD

A motion made under Federal Rule of Civil Procedure 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999); *see also United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009).  The plaintiff bears the burden of proving that subject matter jurisdiction exists.  *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 523 F.3d 453, 459 (4th Cir. 2008).  Accordingly, Waverley "bear[s] the burden of proving that the discretionary function exception does not apply" to the United States' conduct.  *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009).  Additionally, when considering a "Rule 12(b)(1) motion to dismiss, the district court may

regard the pleadings as mere evidence on the issue and may consider evidence outside the

pleadings . . . ." *Blitz v. Napolitano*, 700 F.3d 733, 736 n.3 (4th Cir. 2012) (quoting *Velasco v.*

*Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)).

## ANALYSIS

Waverley brings this lawsuit under the FTCA, which constitutes a "limited waiver" of the

United States' sovereign immunity. *Molzof v. United States*, 502 U.S. 301, 305 (1992). The

FTCA makes the federal government liable for tort claims "in the same manner and to the same

extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674. But this waiver is

"subject to several exceptions." *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006). One

of these is the DFE, under which the United States is not liable for "[a]ny claim . . . based upon

the exercise or performance or the failure to exercise or perform a discretionary function or duty

on the part of a federal agency or an employee of the Government, whether or not the discretion

involved be abused." 28 U.S.C. § 2680(a).

The DFE analysis proceeds in two steps. First, a court must determine whether the

challenged conduct "involves an element of judgment or choice." *Suter*, 441 F.3d at 310

(quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). No such discretion exists when

"a federal statute, regulation, or policy specifically prescribes a course of action for an employee

to follow." *Indem. Ins. Co.*, 569 F.3d at 180 (quoting *Berkovitz*, 486 U.S. at 536). Second, even

if the challenged conduct involves an element of judgment, a court must determine "'whether

that judgment is of the kind that the discretionary function exception was designed to shield,'

i.e., whether the challenged action is 'based on considerations of public policy.'" *Suter*, 441

F.3d at 311 (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)). This inquiry focuses

"not on the agent's subjective intent in exercising the discretion . . . , but on the nature of the

actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

In other words, a court "look[s] to the nature of the challenged decision in an objective, or

general sense, and ask[s] whether that decision is one which we would expect inherently to be

grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir.

1993). A government agent's acts are presumed to be "grounded in policy" when that agent uses

discretion provided by statute, regulation, or agency guideline. *Gaubert*, 499 U.S. at 324.

Accordingly, the question here is whether Waverley has shown that the Army either (1)

lacked discretion regarding its waste management practices or (2) made waste management

decisions of the kind that were not susceptible to policy analysis. If Waverley can show either,

then the DFE does not apply, the United States has waived sovereign immunity, and this court

has subject matter jurisdiction. Waverley challenges two sets of decisions: those relating to past

waste disposal practices (roughly 1955 to 1972) and those relating to ongoing remediation efforts

(roughly 1972 to present). The court applies the DFE analysis to each set of decisions below.

### I.  United States' Waste Disposal at Fort Detrick

Waverley argues the United States' decisions regarding its waste disposal practices in

Area B-11 fall outside the DFE. In Waverley's view, the Army had no discretion to bury TCE

and PCE in unlined waste pits in Area B-11 while Fort Detrick served as the home to the United

States' biological weapons program.[4] Moreover, Waverley asserts that the Army's waste

disposal decisions were not susceptible to policy analysis because they were garden-variety

housekeeping decisions typical of "a landowner with waste to dispose of[.]" (Pl.'s Opp'n 29.)

Neither argument is convincing.

---

[4] Although the biological weapons program at Fort Detrick ended in 1969, the record reflects that the United States may have disposed of the chemical waste at issue in Area B until 1972. Waverley does not contend the United States disposed of TCE or PCE after 1972. Accordingly, for this part of the analysis, the court considers Army decisions made, and directives in force, between 1955 and 1972.

### A.  Discretionary Nature of Waste Disposal Decisions

Waverley cites several dozen provisions as proof that "specific, mandatory duties governed the military's disposal of TCE, PCE, and other wastes at Fort Detrick[.]"  (Pl.'s Opp'n 16.)  For several reasons, none of these provisions carries Waverley's burden at step one.

At the outset, the majority of the provisions were adopted after the Army had stopped disposing of waste at Area B-11.  Those provisions are, therefore, irrelevant for the present analysis.  *See, e.g.*, *Indem. Ins. Co.*, 569 F.3d at 180 (examining only the administrative guidance that was "in existence" at the time government agent engaged in challenged conduct).  Of the twenty-five duties Waverley cites, twenty were implemented after the relevant waste disposal decisions had already been made.[5]

That leaves five provisions that could have bound the Army to a specific course of conduct,[6] but these also failed to remove the Army's discretion.  Waverley notes that several of these provisions contain language such as "must" and "shall" that is, at least on its face, mandatory.[7]  But when those provisions are construed alongside other language within the relevant regulations, they seem closer to statements of policy goals.  For example, other parts of section 263.3 of DoD Directive 5500.5, which Waverley cites as mandatory, state that the "cost of the natural resources and related programs . . . must be accomplished *within financing available* . . . [,]" *id.* § 263.3(a) (emphasis added), and that agencies "are required to comply *insofar as practicable* . . . [,]" *id.* § 263.3(e)(2) (emphasis added).  Similarly, the language Waverley cites from DoD Directive 5100.50 is in a section entitled "Policy" and that also states,

---

[5] These provisions—found at paragraphs 68(f) and 68(g) of Waverley's complaint—include a 1977 DoD Instruction and various versions of Army Regulation 200-1, which was first adopted in 1975.

[6] These provisions—found at paragraphs 68(a) through 68(e) of Waverley's complaint—include DoD Directive 5500.5, Executive Order 11258, and Executive Order 11507.

[7] *See, e.g.*, DoD Directive 5500.5, 30 Fed. Reg. 14908, 14909 (Dec. 2, 1965) (codifying 32 C.F.R. pt. 263) ("[I]nstallation activities *must not* adversely affect neighboring civilian populations or the environment." (emphasis added)); DoD Directive 5100.50, § IV, 31 Fed. Reg. 849, 849 (Jan. 21, 1966) ("Pollution of the environment by the operation of military installations, facilities or buildings *shall* be controlled." (emphasis added)).

"[w]here resources to accomplish pollution control are limited, priority of effort will be afforded" to address "direct hazard[s] to the health of man;" "economic implications;" and "the recreational and esthetic value of our natural resources."  31 Fed. Reg. at 850.

Moreover, some of these directives might not even apply to the challenged conduct.  For example, Waverley cites language in Executive Order 11258, 30 Fed. Reg. 14483 (Nov. 17, 1965), which states that "[f]ederal installations shall provide secondary treatment, or its equivalent, for all wastes except cooling water and fish hatchery effluents."  *Id.* at 14484.  But this executive order was issued under the authority of the Federal Water Pollution Control Act— now known as the Clean Water Act ("CWA")—and it is, at best, uncertain whether that Act applies to groundwater.  *See Rapanos v. United States*, 547 U.S. 715, 739 (2006) (holding that CWA reaches "only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams[,] . . . oceans, rivers, [and] lakes" (alteration in original) (citation and quotation marks omitted)); *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, --- F. Supp. ----, 2014 WL 2573052, at *10 (E.D.N.C. June 9, 2014) ("Congress did not intend for the CWA to extend federal regulatory authority over groundwater . . . .").

But the court need not decide whether these provisions were mandatory or applied in the first instance to the Army's conduct because none of the provisions were sufficiently specific to bind the Army.  To prove the Army lacked discretion, Waverley must point to a directive that gave the United States "*specified* instructions that it [wa]s compelled to follow."  *Williams v. United States*, 50 F.3d 299, 309 (4th Cir. 1995) (emphasis added); *see also Baum*, 986 F.2d at 722 n.2 (noting that language in construction standard stating that "[s]ubstantial railings along each side of the bridge shall be provided for the protection of traffic" was "far too general to

serve as a mandatory regulation" for DFE purposes); *accord Loughlin v. United States*, 286 F.

Supp. 2d 1, 8 (D.D.C. 2003) ("Not all regulations satisfy [the step one] standard; . . . a directive

must 'be mandatory and it must clearly and specifically define what the employees are supposed

to do.'" (quoting *C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 799 (8th Cir. 1993))).  None of

Waverley's cited provisions do this.  For example, DoD Directive 5500.5's declaration that

Army activities "must not adversely affect neighboring civilian populations or the

environment[,]" 30 Fed. Reg. at 14909, does not "specifically prescribe[] a course of action for

[the Army] to follow" in disposing of TCE and PCE at Fort Detrick, *Berkovitz*, 486 U.S. at 536.

The other provisions existing at the time, (*see* Compl. ¶ 68(b)-(e)), fail for the same reason.[8]

Case law bolsters the conclusion that the Army retained discretion regarding its disposal

of chemical waste in Area B-11; practically all cases considering analogous military-caused

contamination have held that the DFE applied to past military waste disposal decisions.[9]

Within the Fourth Circuit, *Horton v. United States*, 3:13-cv-947-CMC, 2014 WL

2780271 (D.S.C. June 19, 2014) (unpublished), and *Oxendine v. United States*, Civil No. 3:08-

4036-CMC-PJG, 2009 WL 3757517 (D.S.C. Nov. 9, 2009) (unpublished), are instructive.[10]  In

both, landowners sued the United States on the basis of TCE contamination of groundwater

caused by waste disposal practices at Shaw Air Force Base.  And in both cases, the court held the

DFE barred plaintiffs' claims, in part because plaintiffs had not identified any directive

"prescrib[ing] a specific and mandatory course of action" regarding the Air Force's efforts "to

---

[8] At the motions hearing, Waverley argued that Executive Order 11258's "secondary treatment" requirement was sufficiently specific.  In support, Waverley cited *Starrett v. United States*, 847 F.2d 539 (9th Cir. 1988), which held that Executive Order 11258 "constitute[d] a specific and mandatory direction to the Navy to provide secondary treatment for wastes and to prevent their being discharged if they constitute[d] a health hazard . . . ." *Id.* at 541. Beyond the fact that *Starrett* is only persuasive authority, this court declines to rely on that case because its reasoning varies from that used by the overwhelming weight of authority, as explained further below.

[9] In fact, Waverley recognizes that "many claims of environmental contamination at military facilities have been dismissed on the basis of the discretionary function exception."  (Pl.'s Opp'n 14.)

[10] Unpublished cases are cited for the soundness of their reasoning, not for any precedential value.

preserve and improve surface and underground waters." *Horton*, 2014 WL 2780271, at *4. In *Oxendine*, the court emphasized chronology, noting that "TCE was apparently used at Shaw AFB in the 1940 and 1950s" but "was not regulated as a toxic pollutant until 1978 . . . ." 2009 WL 3757517, at *2. Because the plaintiff could not "establish TCE use at Shaw AFB *after* the enactment of the environmental statutes and regulations governing TCE[,] . . . the military's actions regarding TCE prior to the regulation of that contaminant f[e]ll within the [DFE]." *Id.* at *5 (emphasis in original).

Courts beyond the Fourth Circuit are in accord with *Horton* and *Oxendine*. In *Aragon v. United States*, 146 F.3d 819 (10th Cir. 1998), for example, landowners next to Walker Air Force Base sought compensation for TCE contamination of their water wells. Plaintiffs cited various sections of the Air Force Manual existing at the time of disposal, including one section which stated that the discharge of toxic wastes must be "stringently controlled." *Id.* at 825. Despite the manual's ostensibly mandatory and specific language, the Tenth Circuit concluded the Air Force retained "discretion to determine how to dispose of TCE-contaminated waste water" because that section "d[id] not prescribe specific, mandatory waste water disposal methods or treatment procedures." *Id.* at 825-26. In *Snyder v. United States*, 504 F. Supp. 2d 136 (S.D. Miss. 2007), *aff'd*, 296 F. App'x 399 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 2763 (2009), former service members alleged that the disposal of TCE and PCE at Camp Lejeune during the early 1970s caused a congenital heart defect. The plaintiffs cited a Navy regulation stating that "refuse, in any form, should not be disposed of where it may pollute surface or underground waters which are eventually to be used as drinking water." *Id.* at 141. The court held the regulation did not remove the Navy's discretion in deciding how to dispose of the complained-of contaminants— TCE and PCE—both because those contaminants were not specifically regulated at the time and

because the regulation did not "offer any specific guidance regarding how to dispose of refuse, leaving to military personnel th[at] determination . . . ." *Id.*

The present case is no different. The record reflects that the Army stopped disposing of waste at Fort Detrick by 1972, but the harmful contaminants at issue here were not subject to regulation until 1978 at the earliest. And the provisions Waverley cites are far too general. Because "there were no government regulations which specifically regulated TCE and PCE at the time" the Army disposed of those chemicals in Area B-11, *id.* at 141, and because no existing regulations stated with sufficient specificity how the Army was to dispose of TCE and PCE, the court concludes the Army retained discretion as to how it disposed of waste at Fort Detrick.

Waverley nevertheless argues that a mandate not to dispose of waste in a way that could pollute groundwater and endanger public health "does not become discretionary merely because the particular practices that could result in such pollution are not specified." (Pl.'s Opp'n 19.) In Waverley's view, "[s]o long as the Army's disposal 'could' pollute groundwater and endanger public health or welfare, they were prohibited." (*Id.*) Waverley presents evidence that, even though TCE and PCE were not yet formally regulated as hazardous substances under the existing environmental laws, the Army "knew or should have known that burying chemical waste . . . in a karst terrane was inappropriate and not a safe disposal practice." (Tonkin & Hennet Decl. ¶¶ 40-42.) That knowledge, Waverley argues, was sufficient to trigger the Army's duty to stop disposing of chemicals in unlined waste pits at Area B-11.

Waverley's argument fails for several reasons. As an initial matter, it ignores one of *Berkovitz*'s primary teachings: a directive must have "*specifically* prescribe[d] a course of action . . . ." 486 U.S. at 536. Moreover, Waverley's focus on what consequences the Army's conduct *could* have had on the environment resembles an assessment of the Army's conduct under a

negligence standard.  Yet "negligence on the part of the [Army] . . . is largely irrelevant to the discretionary function inquiry."  *Baum*, 986 F.2d at 722 n.2.  The question is not what the Army could or should have done at the time, *see Loughlin*, 286 F. Supp. 2d at 8 (noting that DFE analysis "does not hinge upon whether [the government's] decisions were wise and commendable, or . . . unwise and deplorable"), but rather whether some directive required the Army to follow a specific course of conduct with respect to waste disposal decisions.  Finally, in making its argument, Waverley essentially admits the Army had discretion regarding its waste disposal practices.  Waverley's expert declared that "early guidance for disposal of chlorinated solvents *focused on* evaporating the volatile solvents into the atmosphere . . . [and] *did not advocate for* the disposal of chlorinated solvents into the groundwater system." (Tonkin & Hennet Decl. ¶ 40 (emphasis added)).  That statement suggests that any sort of directive existing at the time was mere guidance and that the Army retained discretion to select from among various methods of disposing waste into pits.

Waverley also cites several cases that apparently held the DFE did not apply under "similar circumstances."  (Pl.'s Opp'n 14.)  But these cases are far from similar.  For example, *Chang-Williams v. Dep't of the Navy*, 766 F. Supp. 2d 604 (D. Md. 2011), not only involved a remarkably different factual context,[11] but also involved conduct deemed unprotected (i.e., "the United States' decision to ignore its own promise") that is not present here—the United States made no promises to Waverley.  Although Waverley relies on *W.C. & A.N. Miller Cos. v. United States*, 963 F. Supp. 1231 (D.D.C. 1997), to suggest that decisions regarding safety are less likely to "involve[] social, economic, or policy considerations[,]" *id.* at 1241, that decision's holding

---

[11] The plaintiff's family had been brutally attacked by a Marine Corps sergeant.  The Marine Corps had issued a protective order against the sergeant and had also explicitly promised to protect the plaintiff's family.  The court held that the DFE did not apply because the Marine Corps' disregard of its "specific assurances" to the plaintiff that she and her family would be protected was not discretionary.  *Id.* at 618.

concerned a failure to warn, *see id.*, not how the waste was disposed of, *see id.* at 1240.[12]  And

*Clark v. United States*, 660 F. Supp. 1164 (W.D. Wash. 1987), is "distinguishable and of

questionable current vitality because it was decided before the Supreme Court adopted the [DFE]

analysis standards of *Berkovitz* and *Gaubert*."  *Aragon v. United States*, 950 F. Supp. 321, 326

(D.N.M. 1996), *aff'd*, 146 F.3d 819 (10th Cir. 1998).  Instead of analyzing the decisions'

theoretical susceptibility to policy analysis, the *Clark* court analyzed whether the government

had actually relied on policy considerations in making its waste disposal decisions.  *See* 660 F.

Supp. at 1176 (concluding DFE did not apply because Air Force failed actually "to consider the

effect of groundwater in selecting and operating waste disposal facilities on McChord [Air Force

Base]").

　　　Waverley also relies on *Jones v. United States*, 691 F. Supp. 2d 639 (E.D.N.C. 2010), but

this case too is distinguishable and demonstrates why the DFE does not apply here.  In *Jones*, the

plaintiff alleged she developed non-Hodgkin's lymphoma from being exposed to DCE, TCE, and

PCE while stationed at Camp Lejeune from 1980 to 1983.  *Id.* at 640.  The court distinguished

*Snyder* and held that the DFE did not apply.  A relevant 1972 Navy Bureau of Medicine and

Surgery ("BUMED") instruction for Camp Lejeune mandated that "[d]rinking water shall not

contain impurities in concentrations which may be hazardous to the health of consumers," and

specifically limited the acceptable levels of chlorinated hydrocarbons.  *Id.* at 642.  Because the

military had allowed concentrations of the complained-of chemicals to exceed those specific

limits, the alleged contamination "was not a matter committed to discretion subject to policy

analysis at the time of Plaintiff's residence at Camp Lejeune."  *Id.*  In the present case, just as in

*Snyder*, no specific limits had yet been set on TCE and PCE.

---

[12] Moreover, a subsequent decision in the District of the District of Columbia was "unable to agree with [*Miller*]'s holding" and noted that the *Miller* decision was "legally flawed" because it relied on an "outmoded distinction between 'planning' and 'operational' decisions."  *Loughlin*, 286 F. Supp. 2d at 25-26.

Accordingly, Waverley has not shown that the United States lacked an element of choice regarding its decisions to dispose chemicals such as TCE and PCE in unlined pits in Area B-11.

### B.  Waste Disposal Decisions' Susceptibility to Policy Analysis

Waverley argues that, even if the United States was not bound by any mandatory and specific directive regarding the disposal of TCE and PCE, when the government makes decisions while "acting as a private landowner, . . . the discretionary exception does not extend to such decisions." *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 36 (D.D.C. 2002).  In Waverley's view, decisions regarding waste disposal reflect "mundane, administrative, garden-variety, housekeeping problem[s] that [are] about as far removed from the policies applicable to the [Army's] mission as it is possible to get." *Hawes v. United States*, 409 F.3d 213, 227 (4th Cir. 2005) (Motz, J., dissenting) (quoting *Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997)).  That the Army was "merely doing what everyone else in industry was doing[,]" (Pl.'s Opp'n 29), apparently bolsters Waverley's point that the Army's use and disposal of TCE and PCE "did not reflect any exercise of military function or authority[,]" (*id.* at 30).  And Waverley emphasizes that, "[e]ven when military actors are involved, courts must be careful not to read the discretionary function exception so broadly as to allow it to swallow the whole of the FTCA." *Chang-Williams*, 766 F. Supp. 2d at 617-18.

Waverley's argument oversimplifies the nature of the Army's waste activities at Fort Detrick.  To characterize Army decisionmaking on this issue as mere "garden-variety housekeeping" ignores the factors the Army would have had to consider as it was operating Fort Detrick's biological warfare program, including national security, resource constraints, and environmental impact.  Case law supports the conclusion that waste disposal decisions of the kind the Army made were susceptible to policy analysis. *See, e.g.*, *OSI, Inc. v. United States*,

285 F.3d 947, 953 (11th Cir. 2002) ("The nature of the military's function requires that it be free to weigh environmental policies against safety and military concerns."); *Aragon*, 146 F.3d at 826 (finding "little doubt" that Air Force base operating "under military exigencies" made waste disposal decisions that "involved policy choices of the most basic kind").

Waverley cites cases "at the opposite end of th[e] spectrum," *Loughlin*, 286 F. Supp. 2d at 23 n.19, from the complex military waste disposal decisions at issue here: *Maalouf* involved a sledding accident on embassy property; *Hawes* involved the failure to maintain an on-base obstacle course; and *Carney v. United States*, 368 F. Supp. 2d 439 (D. Md. 2005) (Blake, J.), involved a failure to warn about a known hazard in a ship's fan room.  In other words, those cases involved "prosaic" acts and omissions "made by the [government] as an administrator or landowner," rather than, as here, "fundamental choices about how best to test and discard experimental munitions developed during wartime."  *Loughlin*, 286 F. Supp. 2d at 23 n.19.

Accordingly, Waverley has not shown that the Army's decisions to dispose of chemical waste in unlined pits in Area B-11 were of the kind insusceptible to policy analysis.

## II.  United States' Waste Remediation at Fort Detrick

Waverley argues separately that the United States' decisions regarding its waste remediation efforts in Area B fall outside the DFE.  In Waverley's view, in the time since the Army stopped disposing of chemical waste in Area B, the Army has failed to remediate both suspected and known TCE and PCE contamination.[13]  Waverley asserts the Army's decisions not to remediate contamination at Area B-11 were insusceptible to policy analysis both because they implicated safety and because they merely required application of scientific and technical judgment.  Again, Waverley has failed to carry its burden at either step of the DFE analysis.

---

[13] According to Waverley, the Army allegedly first suspected the potential for contamination based on the 1977 initial assessment.  And, as the United States acknowledges, the Army definitively detected contamination in 1991.

### A.  Discretionary Nature of Waste Remediation Decisions

In addition to the directives cited above, Waverley relies on various versions of Army Regulation 200-1 to argue the Army lacked discretion in deciding how to identify, prevent, and remediate contamination at Fort Detrick.  In arguing that "[a]ny discretion the Army had over *how* to act did not afford it discretion about *whether* to act[,]" (Pl.'s Opp'n 27 (emphasis in original)), Waverley implies the Army has done nothing since the 1970s to treat contamination.

The primary problem with Waverley's argument is that it ignores regulations which explicitly left discretion with the Army regarding how to remediate contamination.  As already noted, the 1986 SARA included CERCLA regulations clarifying that the Army's responses to environmental hazards were "discretionary governmental functions" and that the Army did not have a duty "to take any response action at any particular time."  40 C.F.R. § 300.400(i)(3) (originally found at 40 C.F.R. § 300.61(e)(3) (1986)).  Accordingly, from 1986 forward, the Army explicitly retained discretion to decide how to remediate contamination at Fort Detrick.

Furthermore, the Army likely retained discretion regarding remediation efforts even before CERCLA explicitly said so.  Pre-1986 remediation decisions were made within the IRP framework, which was established in 1975.  And that four-phase framework similarly left discretion with the Army as to how to respond to contamination.  *See Western Greenhouses v. United States*, 878 F. Supp. 917, 928 (N.D. Tex. 1995) (describing IRP process).

Even assuming the IRP did not grant full discretion to the Army, Waverley has failed to cite any provision existing between 1972 and 1986 that bound the Army to a specific course of conduct with respect to its waste remediation efforts.  For example, Waverley cites the 1975 version of Army Regulation 200-1, which states that "[w]astes must be either recycled and reclaimed or confined and contained so they will not migrate to re-emerge in pollutant form."  32

C.F.R. § 650.6(b), 40 Fed. Reg. 55,962, 55,964 (Dec. 2, 1975) (codifying Army Regulation 200-1).  But this provision fails because it is not mandatory.  That provision is found in a section explicitly called "Implementing guidance" and which states that subsection (b) constitutes "[g]uidance for implementing [Army] environmental policies . . . ."  *Id.* § 650.6.  Waverley also cites a different section of Army Regulation 200-1, which states that "[a]ll measures to prevent accidental pollution of the environment by uncontrolled release of hazardous chemicals to the air, water, or land environment will be taken by all Army activities."  *Id.* § 650.131(a).  But this provision fails for the same reason as the provisions ostensibly stating nondiscretionary waste disposal obligations: it is not sufficiently specific.  That the Army was required to take "all measures" does not prescribe a specific course of conduct regarding uncontrolled releases of hazardous chemicals into the environment.  Moreover, while Waverley argues section 650.131(a) is sufficiently specific because the regulations define "hazardous," the reality is that the regulation does not amply do so.  In fact, a subprovision of that same section states that "it is difficult to identify materials which should be classified as hazardous or toxic. . . .  Certain chemicals, such as asbestos, cadmium, lead, mercury . . . are recognized as hazardous . . . .  Other materials, however, are more difficult to categorize since excessive amounts of almost anything can be harmful when released."  *Id.* § 650.130(b).[14]

Accordingly, Waverley has not shown that the United States lacked discretion regarding its decisions to remediate TCE and PCE contamination in Area B at any point after 1972.

### B.  Waste Remediation Decisions' Susceptibility to Policy Analysis

Waverley makes two arguments that the Army's waste remediation decisions are insusceptible to policy analysis.  First, Waverley argues that, even if the Army's decision to

---

[14] The court acknowledges that TCE and PCE became federally regulated in 1978.  Even if that clarified that TCE and PCE were hazardous substances, Army Regulation 200-1 still failed to prescribe a specific course of conduct.

pursue a remediation project was discretionary, its "failure to properly oversee the project and ensure safety was not."  (Pl.'s Opp'n 33.)  For this proposition, Waverley cites two Ninth Circuit cases.  *See Myers v. United States*, 652 F.3d 1021 (9th Cir. 2011); *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005).  Second, Waverley argues that matters "of professional and scientific judgment" are unprotected.  *See, e.g.*, *In re Glacier Bay*, 71 F.3d 1447, 1453 (9th Cir. 1995) ("[D]ecisions involving the application of objective scientific standards . . . are not insulated by the [DFE] because they do not involve the weighing of economic, political and social policy." (citation and quotation marks omitted)).

Neither argument shows that the Army's waste remediation decisions were not susceptible to policy analysis.[15]  The remediation decisions here were of the kind that required the Army to balance public safety, health, environmental impact, resource constraints, regulatory constraints, and stakeholder input—not just pure matters of safety or scientific application.  This position finds substantial support in factually analogous cases.  *See, e.g.*, *Daigle v. Shell Oil*, 972 F.2d 1527, 1541 (10th Cir. 1992) (finding "little doubt" that Army's toxic waste cleanup efforts at Rocky Mountain Arsenal "involved policy choices of the most basic kind" because Army faced "a monumental task" in cleaning up the extensive hazardous waste and needed to determine how best to "contain[] the spread of further contamination . . . while still protecting public health"); *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991) (holding that EPA's decisions to delay, on several occasions, cleanup efforts at a scrap yard site involved "'judgment calls' concerning the sufficiency of evidence of violations of applicable regulations, the

---

[15] Moreover, the cases Waverley cites involved more specific mandates, *see Myers*, 652 F.3d at 1029 (holding that the Navy Manual sufficiently specified mandatory review procedure and "le[ft] nothing to the Navy's discretion"); a dissimilar factual context, *see Whisnant*, 400 F.3d at 1183 (involving failure to remove toxic mold in Navy commissary's meat department); or purely technical mandates, *see In re Glacier Bay*, 71 F.3d at 1452-53 (holding that National Oceanic and Atmospheric Administration hydrographers lacked discretion in deciding how far apart sounding lines could be spaced while surveying ocean floor).

allocation of limited agency resources, and determinations about priorities of serious threat to public health" that met step two).  The Army's contamination problem at Fort Detrick is just as complex as those present in *Daigle* and *Lockett*.  And, while not necessarily relevant for the DFE analysis, the Army's actual conduct over the past several decades reflects substantial policy balancing—the Army considered a multitude of factors at every step of the remediation process.

Accordingly, Waverley has not shown that the Army's waste remediation decisions at Area B-11 were of the kind insusceptible to policy analysis.

## CONCLUSION

Waverley has not carried its burden of proving the United States' waste management decisions at Fort Detrick fell outside the DFE.  Waverley has not identified any provision that prescribed a specific course of conduct for the Army regarding disposal and remediation of TCE and PCE at Fort Detrick.  Moreover, all of the Army's decisions were of the kind susceptible to policy analysis—these were decisions that would have had to weigh various national security, social, economic, and environmental considerations.  Because the DFE applies, the court does not have subject matter jurisdiction over this case.  Accordingly, the court will grant the United States' motion to dismiss.

A separate Order follows.


  1/13/2015                                                      /S/
        Date                                        Catherine C. Blake
                                                    United States District Judge


22